**SPENCER TRASK SOFTWARE AND INFORMATION SERVICES, LLC, formerly known as Spencer Trask Internet Group, LLC; and Spencer Trask Ventures, Inc., Plaintiffs,**

v.

**RPOST INTERNATIONAL LIMITED; Zafar Khan; Terry Tomkow; and Ken Barton, Defendants.**

**No. 02 CIV. 1276(PKL).**

United States District Court, S.D. New York.

Feb. 22, 2002.

Patterson, Belknap, Webb & Tyler LLP, Stephen P. Younger, Jon–Peter Kelly, Estella Shoen, New York City, for the Plaintiffs.

Stillman & Friedman, P.C., James A. Mitchell, Nathaniel Z. Marmur, New York City, Hill & Barlow, P.C., Daniel C. Winston, David S. Friedman, Boston, MA, for the Defendant.

## MEMORANDUM ORDER

LEISURE, District Judge.

Plaintiffs Spencer Trask Software and Information Services, LLC ("Information Services"), formerly known as Spencer Trask Internet Group, LLC ("the Internet Group") and Spencer Trask Ventures, Inc. ("Ventures") (with their affiliates collectively as "Spencer Trask") apply pursuant to Rule 65 of the Federal Rules of Civil Procedure for a temporary restraining order ("TRO") against Rpost International Limited ("RPost") preventing RPost from closing its Series C round of financing absent the inclusion of Spencer Trask. For the following reasons, plaintiffs' application is denied.

### Background

Plaintiffs bring this action for *inter alia:* (1) breach of contract; (2) promissory estoppel; (3) equitable estoppel; and (4) unjust enrichment. The case was removed by defendants (who include RPost and its founders and executive Vice Presidents, Zafar Khan, Ken Barton, and Terry Tomkow) on February 19, 2002 one day before the state court was to have a hearing regarding the TRO. Thus, the TRO hearing has been delayed by two days.

At the root of the lawsuit is an agreement allegedly entered into by the parties to enable RPost to finance its new venture involving electronic mail. *See* Plaintiffs' Memorandum of Law in Support of their Application for a Temporary Restraining Order and their Motion for a Preliminary Injunction ("Pls' Mem."), at 2. RPost is an internet company seeking to provide a secure means of sending electronic email that operates like registered mail on behalf of the U.S. Postal Service. *See id.* Plaintiffs contend this new product venture will be very lucrative.

The alleged agreement consisted of four parts: (1) Spencer Trask would provide RPost with $500,000 in Series B financing, subject to Spencer Trask's due-diligence review; (2) the Internet Group would purchase, subject to due diligence, 6% of the fully-diluted outstanding capital stock from each of the three founders for $1.8 million; (3) Spencer Trask would raise or invest $1 million for RPost in its subsequent Series C round of financing provided that two conditions were met: (a) RPost did in fact enter into an exclusive contract with the U.S. Postal Service; and (b) RPost also raised $1 million from other investors for the Series C round of financing; and (4) Spencer Trask agreed to make a non-binding commitment to use its best efforts to raise funds for RPost's Series D round of financing. *See* Pls' Mem. at 5. The overall result of the agreed structure was to give Spencer Trask the right to acquire approximately 20% of RPost stock.

On November 1, 2001, following an agreement made *by handshake* on August 22, 2001, several phone conversations, and Spencer Trask's sending of formalized drafts, Spencer Trask performed the first part of the agreement by investing $500,000 in RPost's Series B round of financing. *See* Affidavit of Kevin Kimberlin, ("Kimberlin Aff.") ¶ 19. However, on Jan-uary 15, 2002 the parties met again and RPost's co-founder Barton told Spencer Trask that its circumstances had changed and they "did not need" that deal anymore. *See* Kimberlin Aff. ¶ 43.

Defendants contend that although they did agree in principle to the terms initially proposed by Spencer Trask, the parties could never come to an agreement about the material details of the deal. *See* Defendants' Memorandum in Opposition to Plaintiffs' Application for Temporary Restraining Order and Motion for Preliminary Injunction ("Defs' Mem."), at 1; Affidavit of Zafar Khan in Opposition to Plaintiffs' Motion for Preliminary Injunction ("Khan Aff.") ¶¶ 8–9. Moreover, they assert that the drafts sent to them by plaintiffs following the oral agreement in principle included materially different terms from the original proposal. Khan Aff. ¶ 9. Further, they contend that subsequent communications evidence that plaintiffs referred to the proposal as a "possible transaction" thus supporting defendants' contention that the four part agreement was never consummated. Khan Aff. ¶ 12; Confidentiality Agreement (attached as Exhibit E to Khan Aff.). Thus, the parties are in distinct disagreement as to most of the facts surrounding the formation, if any, of a binding contract in this case.

Plaintiffs argue that a TRO is necessary to prevent RPost from completing the Series C round of financing because they will suffer the irreparable harm of having their $500,000 investment in the company considerably diluted and will lose a valuable investment opportunity. Such harm, they contend, could not be corrected by a subsequent legal judgment in their favor, because instead of having a 20% interest in the company, they would be left with a 2% interest and there would be no way to predict the monetary value of this lost

ownership interest. *See* Pls' Mem. at 8–9. According to plaintiffs, they structured the alleged agreement to avoid the possibility that RPost would use Spencer Trask's investment and its reputation to leverage additional financing from other sources and then dilute Spencer Trask's holdings. *See* Kimberlin Aff. ¶ 46.

Defendants argue in response that plaintiffs will not suffer irreparable harm if their requested TRO is not granted because as to the founders' shares, if plaintiffs' breach of contract claim is successful, each would still be able to sell their shares to plaintiffs for a total of 18% of the company. *See* Defs' Mem. at 18. Further, defendants contend that Spencer Trask could still participate in the Series C financing presently taking place and they also point out that the two conditions precedent within the alleged four part agreement still have not occurred. *See id.* at 19. Defendants also assert that they have gained no advantage by using Spencer Trask's reputation and name to increase financing from other sources. *See* Khan Aff. ¶ 12.

Defendants further argue the balance of hardships actually tips in their own favor because an injunction would disrupt RPost's operations and efforts to raise capital and would inflict harm on other shareholders. Defs' Mem. at 21. Further, they urge the Court to consider the precedential result from issuing a TRO. That is to say, defendants argue an injunction would send a clear message to all prospective investors in start-up companies that they simply can sue to interrupt financing based solely on oral communications when they are unable to achieve results through consensual negotiations. *See id.*

Plaintiffs have agreed to post an undertaking in the amount of $1 million pending the resolution of a preliminary injunction motion, which is the amount of their promised investment in the Series C round.

### Discussion

The standard for granting a temporary restraining order and a preliminary injunction pursuant to Rule 65 of the Federal Rules of Procedure are identical. It is well established that in order to obtain such relief, the movant must show: "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief". *See Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979). Whether injunctive relief should issue or not "rests in the sound discretion of the district court which, absent abuse of discretion, will not be disturbed on appeal." *Reuters Ltd. v. United Press Int'l, Inc.,* 903 F.2d 904, 907 (2d Cir.1990) (quoting *Thornburgh v. American College of Obstetricians and Gynecologists,* 476 U.S. 747, 755, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986)).

A temporary restraining order pursuant to Fed.R.Civ.P. Rule 65(b) is designed to preserve the status quo. "The purpose of a temporary restraining order is to preserve an existing situation *in status quo* until the court has an opportunity to pass upon the merits of the demand for a preliminary injunction." *Warner Bros. Inc. v. Dae Rim Trading, Inc.,* 877 F.2d 1120, 1125 (2d Cir.1989) (quoting *Pan American World Airways, Inc. v. Flight Engineers' Int'l Ass'n,* 306 F.2d 840, 842–43 (2d Cir. 1962)). Thus, a temporary restraining order should issue for just so long as is necessary to hold a hearing. *See Granny Goose Foods, Inc. v. Brotherhood of Teamsters,* 415 U.S. 423, 439, 94 S.Ct. 1113, 39 L.Ed.2d 435 (1974).

■ The Second Circuit has deemed the threshold showing of "irreparable harm" to be of particular significance under Rule 65, regardless of the strength of the movant's case on the merits. *See, e.g., Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir.1990) ("a showing of probable irreparable harm is the 'single most important prerequisite for the issuance of a preliminary injunction'") (quoting *Bell & Howell: Mamiya Co. v. Masel Supply Co. Corp.*, 719 F.2d 42, 45 (2d Cir.1983)). Accordingly, "[i]rreparable harm must be shown by the moving party to be imminent, not remote or speculative, and the alleged injury must be one incapable of being fully remedied by monetary damages." *Reuters*, 903 F.2d at 907 (citing *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 972 (2d Cir.1989)). The movant is required to establish not a mere *possibility* of irreparable harm, but that it is *"likely* to suffer irreparable harm if equitable relief is denied." *JSG Trading Corp. v. Tray–Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir.1990) (emphasis in original). "Likelihood sets, of course, a higher standard than 'possibility.'" *Id.*

■ Plaintiffs' main contention is that if the Series C financing continues, Spencer Trask will suffer the immediate and irreparable injury of having its stake in the company "drastically diluted." They substantiate this claim by citing cases they argue demonstrate the "uniqueness" of equity interests that render remedies at law inadequate. Their proposition is that the dilution of a plaintiff's stock constitutes irreparable harm.

However, as defendants point out, each of the cases cited present very different factual scenarios, none of which fully substantiate their proposition. For example, plaintiffs cite *Street v. Vitti*, 685 F.Supp. 379, 384 (S.D.N.Y.) wherein the Court found under the facts of that case that plaintiff shareholders had shown the threat of irreparable harm because the sale of additional shares would reduce their holdings to less than 20%, thus eliminating their rights under the state law that prevents dissolution of a corporation. And in *Rebell v. Muscat*, 26 A.D.2d 685, 272 N.Y.S.2d 478, 479 (N.Y.A.D.1996), the Court affirmed a preliminary injunction where the defendant corporate officers intended to effect a 20% dilution of outstanding shares by exercising stock options themselves.

It is unclear to the Court how plaintiffs find these cases applicable to their own situation. They presently own only 2% of the corporation and the continuing of the Series C financing likely will not irreparably harm their efforts to retain the additional 18% of stock, because as defendants note, they might still be able to buy these shares after the Series C round has ended. Moreover, it does not seem that closing the Series C round will cause Spencer Trask irreparable harm with respect to its Series B $500,000 investment. Under the terms of the Promissory note delivered by RPost to Spencer Trask, Spencer Trask's Series B investment will be converted into shares of stock at a 50% discount rate based on the price set during the Series C round of financing. *See* Defs' Mem. at 19. The participation in additional Series C investors may cause Spencer Trask to receive fewer total number of shares, but this would not result in a dilution of *value* of the stock because the price per share would be higher. *See* Khan Aff. ¶ 18.

In any event, the Court does not find that plaintiffs have sufficiently shown the important threshold requirement that they would suffer irreparable harm if the Series C round of financing were to close. Moreover, turning to the second prong of the test, the Court does not find that there is a "likelihood of success on the merits" and

even though plaintiffs have shown "serious questions going to the merits" of their causes of action, the Court is not entirely satisfied that the balance of hardships tips decidedly in plaintiffs' favor. Instead, it appears that the defendants' also will endure hardship in the disruption of their efforts to raise capital for an upstart company. Therefore, the weight of hardships does not tip *decidedly* toward the plaintiffs in this case.

### Conclusion

For the foregoing reasons, plaintiffs' application for a temporary restraining order is hereby denied.

**SO ORDERED.**